AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

3/2/23

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No. |
| 4056 PRESCOTT AVENUE, | ) |
| DAYTON, OHIO 45406 | ) |
| | ) 3:23-mj-73 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§  841 & 846 | Possession with intent to distribute a controlled substance; conspiracy to commit a Title 21 offense |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Eric J. McIntosh, FBI SA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ Telephone _____ *(specify reliable electronic means).*

Date:  _____ March 2, 2023 _____

City and state:  _____ Dayton, Ohio _____

Caroline H. Gentry
United States Magistrate Judge

## ATTACHMENT A

*Property to Be Searched*

The property to be searched is 4056 Prescott Avenue, Dayton, Ohio 45406 (the **TARGET RESIDENCE**), pictured below, and further described as a single-family residence with red brick, white trim, and red roof shingles. The stained wood front door has a black security/storm door. The property to be searched also includes any vehicles located on the premises or the curtilage of the premises during the execution of the search warrant, including, but not limited to, the black Jeep Cherokee bearing Ohio license plate JJY9189, VIN # 1C4RJFAG2JC286226, and the grey Dodge Ram 1500 bearing Ohio license plate JYQ6682, VIN # 1D7HU18D83J649571.

 



**ATTACHMENT B**

*Items to be Seized*

All items and records relating to violations of Title 21 U.S.C. §§ 841 and 846, those violations involving Joshua Daniel PAYNE and/or co-conspirators and probable co-conspirators and occurring in or after July 1, 2020, including:

a. Any and all controlled substances (as defined under Title 21, United States Code, § 812), including, but not limited to, methamphetamine, cocaine, and fentanyl;

b. Any information related to the use, possession, receipt, transfer, transportation, and/or purchase of controlled substances;

c. Records of drug customers and related identifying information;

d. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

e. Any information related to sources of drugs or others involved in the possession or distribution of drugs (including names, addresses, phone numbers, or any other identifying information);

f. Paraphernalia associated with the manufacture, distribution, sale, import, export, storage, conversion, preparation for sale and use of any controlled substances, including scales, measuring devices, bottles, balloons, baggies, plastic wrap, plastic envelopes, film canisters and cutting, conversion, and adulteration agents;

g. Records showing evidence of importing, smuggling, and distributing drugs, including books, ledgers and diaries, address books and lists, buyer and seller

lists, notebooks, IOU's, spreadsheets, rolodexes, telephone bills, telephone answering pads, bank and financial records, wire transfer records, express consignment mailing labels (including Federal Express, DHL, U.S. Postal Express Mail, UPS, and other similar labels), evidence of offsite storage (such as storage locker receipts and safety deposit box rental records and keys), documents showing domestic or international travel (such as airline tickets, itineraries, passports, and the like), and receipts showing imports or exports (such as shipper's export declarations, bills of lading, invoices, tax identification number paperwork, and other similar documents);

h. Currency (whether U.S. or foreign) and financial instruments, including travelers checks, bonds, stock certificates, cashier's checks, certificates of deposit, and money orders, derived from the sale of controlled substances in violation of Title 21, United States Code, §§ 841 and 846, and money wrappers, rubber bands, money containers, and money counting machines;

i. Precious metals, jewelry, or other high-value items that could be obtained with the proceeds of the sales of controlled substances;

j. Any and all records, documents, and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other high-value items that could be obtained with the proceeds of the sales of controlled substances;

k. Any boxes, bags, briefcases, suitcases, containers, or other items that could be used to mail, carry, import, export, smuggle, or transport marijuana or any other controlled substances;

l. Photographs (both paper and digital form) and video and audio recordings which document an association with other co-conspirators and/or display drug trafficking methods, narcotics, firearms, or money and proceeds from narcotics transactions;

m. All records, documents, and materials showing control, possession, custody, dominion or other indicia of occupancy over physical premises, including but not limited to: personal mail, checkbooks, personal identification, personal effects, notes, other correspondence, utility and other bills, internet service provider documents, letters, rent receipts, mortgage and loan documents, financial documents, vehicle registration information or ownership warranties and keys;

n. Any and all electronic or communication devices including, but not limited to, cellular telephones (including the cell phone assigned call number (404) 386-7603), smart phones, portable electronic devices such as tablet computers, laptops, iPads, or electronic storage media, and other electronic or communication devices which could be used to facilitate drug trafficking;

o. Firearms and ammunition;

p. Firearms accessories, such as ammunition magazines, silencers, gun cases, magazines, and spare parts;

q. Firearms source records, including lists of prices, correspondence, notation logs, receipts, journals, books, telephone records, telephone bills, address books, bank statements, and other documents or devises noting the price, quantity, dates, and/or times when firearms were purchased possessed,

35

transferred, distributed, or sold, and the identities of the parties involved in the transaction;

r.  Photographs, video and audio recordings, text messages, chats, emails, and other communications (and associated contact information), in electronic or other form, related to the possession, acquisition or transfer of controlled substances, firearms, firearms parts and accessories, or ammunition;

s.  Any information related to the acquisition of cars (including rental vehicles) or cellular phones; and

t.  Records and information relating to the identity or location of coconspirators.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2.  For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence

36

of the presence or absence of security software designed to detect malicious

software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to

determine the chronological context of computer access, use, and events relating

to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime

under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar

containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to

eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to

access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or

to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the

COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including

firewall logs, caches, browser history and cookies, "bookmarked" or "favorite"

web pages, search terms that the user entered into any Internet search engine, and

records of user-typed web addresses;

      m.  contextual information necessary to understand the evidence described in this

attachment.

As used above, the terms "records" and "information" includes all forms of creation or

storage, including any form of computer or electronic storage (such as hard disks or other media

that can store data); any handmade form (such as writing); any mechanical form (such as printing

or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives,

videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical,

or other high speed data processing devices performing logical, arithmetic, or storage functions,

including desktop computers, notebook computers, mobile phones, tablets, server computers, and

network hardware.

The term "storage medium" includes any physical object upon which computer data can

be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and

other magnetic or optical media.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

IN THE MATTER OF THE SEARCH OF
4056 PRESCOTT AVENUE,
DAYTON, OHIO 45406

Case No. _____

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Eric J. McIntosh, being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 4056 Prescott Avenue, Dayton, Ohio 45406, hereinafter "**TARGET RESIDENCE**," further described in Attachment A, for the things described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since August of 2003.  My primary duties as a Special Agent consist of investigating criminal enterprises, narcotics investigations, organized crime, and violent crimes to include unlawful possession and possession with the intent to distribute of controlled substances, as well as the associated conspiracies in violation of Title 21, United States Code, Sections 841, 843 and 846.  I am familiar with federal firearms laws, and investigations into possession of a firearm by a convicted felon, possessing a firearm in furtherance of a drug trafficking crime and the associated violations of Title 18, United States Code, Sections 922 and 924.  As part of my standard training to become a Special Agent with the FBI, I have received specialized training in the means and methods by which individuals and drug trafficking organizations conduct their illegal drug

trafficking activities, as well as in the use of various investigative techniques used to uncover unlawful drug trafficking organizations. Based upon my experience and training, I am familiar with the ways in which drug traffickers conduct their unlawful drug trafficking activity, including, but not limited to, their use of code words and numbers to conduct their transactions, their use of multiple telephones to conduct their illegal activities, their methods for concealing narcotics and narcotics proceeds and their use of firearms, violence, and threats of violence to protect their criminal organization. I have received further specialized training concerning the interception of wire communications.

3.      I have participated in various types of electronic surveillance, including the interception of wire communications, in investigations of drug traffickers, money launderers and violent criminal enterprises. I am also familiar with, and have personally participated in, other normal methods of investigating criminal enterprises, including, but not limited to, visual surveillance, the questioning of witnesses, the use of informants, undercover operations, and the use of pen registers, including pen registers in the form of digital analyzers.

4.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## **PROBABLE CAUSE**

### A.  **Overview of the Investigation**

5.      The United States, including the FBI, is conducting a criminal investigation of Joshua Daniel PAYNE ("PAYNE")[1] and other coconspirators, both known and unknown,

---

[1] PAYNE's criminal history includes numerous state felony drug arrests and convictions resulting in terms of confinement. For example, on or about December 26, 2003, PAYNE was convicted of possession of cocaine by the State of Ohio and sentenced to three years' confinement in an Ohio prison. Most recently, in 2015, he was convicted of drug trafficking and sentenced to nine months' confinement.

regarding possible violations of possession with intent to distribute controlled substances, distribution of controlled substances, and conspiracy to distribute controlled substances, in violation of Title 21, U.S.C., §§ 841(a)(1) and 846 (collectively referred to as the "Subject Offenses"). Specifically, FBI Cincinnati, the Ohio Bureau of Criminal Investigation ("BCI"), and the Warren County Drug Task Force ("WCDTF") are investigating a Dayton area, poly-drug distribution network led by PAYNE.

6.     As described in more detail below, agents have conducted physical and electronic surveillance of PAYNE, and have conducted three controlled purchases of drugs from PAYNE. The evidence gathered from my investigation suggests that PAYNE lives at and uses the **TARGET RESIDENCE** in furtherance of his drug trafficking activities.

**B.  Law enforcement learned that PAYNE traffics drugs in the Dayton, OH area.**

7.     From January 2023 to the present, agents and officers obtained information from a Confidential Informant ("CI-1")[2] with direct knowledge of PAYNE's drug trafficking organization.  CI-1 positively identified PAYNE as a Dayton-based methamphetamine and fentanyl supplier who is currently selling drugs in and around the Dayton, OH area. CI-1 told law enforcement that PAYNE uses phone number (404) 386-7603 (the "7603 Phone").

**C.  In the past month, PAYNE sold drugs to an undercover agent on three separate occasions.**

**i.     PAYNE sold drugs to an undercover agent on February 1, 2023.**

8.     On February 1, 2023, a BCI Special Agent, acting in an undercover capacity ("UC"), purchased from PAYNE eight ounces of methamphetamine and half an ounce of

---

[2] CI-1 has provided information to officers that has proven to be reliable and truthful.  CI-1 is cooperating with law enforcement due to a pending criminal investigation into possible violations of state of Ohio drug laws.  Although no promises have been made to CI-1, CI-1 is motivated to cooperate with law enforcement in hopes of consideration during the prosecution of his/her criminal case. CI-1 has never provided materially false information.

fentanyl for $1,700 at the residence located at 4056 Prescott Avenue, Dayton, Ohio 45406 (hereinafter, "**TARGET RESIDENCE**").  The UC arranged the drug transaction by contacting PAYNE at the 7603 Phone[3] in recorded text messages and phone calls.  During a recorded call, PAYNE agreed to sell the UC methamphetamine and fentanyl at whatever price the UC had paid to past drug dealers.  Shortly after the call, the UC sent PAYNE a text asking, "u good with 1700 for both," referring to $1,700 total for eight ounces of methamphetamine and half an ounce of fentanyl.  PAYNE texted back agreeing to the $1,700 purchase price for that quantity of drugs.

9.     On February 1, 2023, at approximately 2:30 PM, agents and officers established surveillance near the **TARGET RESIDENCE**.  Agents observed a black Jeep Cherokee, bearing Ohio license plate JJY9189[4] and VIN # 1C4RJFAG2JC286226 (the "black Jeep Cherokee"), parked in the driveway of the residence.  Agents know, based on past physical and electronic observations of PAYNE, that PAYNE uses the black Jeep Cherokee.

10.     On February 1, 2023, beginning at approximately 3:00 p.m., the UC and PAYNE exchanged several recorded telephone calls and text messages in which PAYNE, using the 7603 Phone, directed the UC to 4060 Prescott Avenue, a residence located directly next to the **TARGET RESIDENCE**.

11.     On February 1, 2023, at approximately 4:15 p.m., the UC, as observed by surveillance agents, pulled into the driveway of 4060 Prescott Avenue.  The UC then placed a recorded telephone call to PAYNE at the 7603 Phone.  The UC told PAYNE that the UC was in the driveway of what looked like an abandoned house.  PAYNE explained to the UC that he

---

[3] All of PAYNE's communications with the UC, including text messages and calls, were placed either to or from the 7603 Phone. PAYNE never used any other phone number to contact the UC.

[4] Ohio license plate JJY9189 is registered to a 2018 Jeep Grand Cherokee, with a registered owner of M.S. residing at 4095 Redonda Lane, Dayton, Ohio. At this time, there is no known connection between M.S. and PAYNE.

(PAYNE) "has everyone come there to keep everyone safe." Based on my training and experience, I believe that PAYNE provided the UC with an address that was not a primary residence associated with PAYNE in an effort to attempt to detect law enforcement involvement in a controlled drug purchase, and/or to assess whether the UC intended to rob PAYNE. By sending the UC (or any drug purchaser) to a neighboring residence, PAYNE can observe the individual and assess his or her intentions before making contact in order to—as PAYNE put it— "keep everyone safe."

12.     After explaining why he directed the UC to an abandoned house, PAYNE told the UC to come to the driveway next to the Jeep. The UC moved the UC vehicle to the driveway of the **TARGET RESIDENCE** and parked next to the black Jeep Cherokee. PAYNE then directed the UC to come inside the **TARGET RESIDENCE**. The UC exited the UC vehicle and walked towards the side of the **TARGET RESIDENCE**, where the UC observed PAYNE in the side yard, motioning for the UC to walk over to him.

13.     The UC proceeded to walk to the backyard of the **TARGET RESIDENCE** where PAYNE was standing. PAYNE and the UC then entered the **TARGET RESIDENCE** through the back door. Once inside, the UC saw an unidentified man sitting at a table. On the table, the UC observed a large number of bags containing what appeared to be processed marijuana; clear bags containing a clear crystal-like substance the UC recognized as methamphetamine; and a large bag containing a hard cream-colored substance the UC recognized as fentanyl. Additionally, the UC saw large stacks of United States currency at the end of the table.

14.     PAYNE then broke off a half ounce of fentanyl from the large bag on the table containing the hard cream-colored substance. PAYNE had a scale next to the large bag and used it to weigh the fentanyl. After weighing it, PAYNE put the fentanyl in a clear bag. PAYNE,

5

who had already placed a half pound of methamphetamine in a different clear bag, handed the UC both bags. After receiving the bags, the UC handed PAYNE $1,700 of pre-recorded confidential funds, which PAYNE counted. After counting the money, PAYNE accompanied the UC out the back door of the **TARGET RESIDENCE** and walked with the UC to the driveway where the UC's vehicle was parked. While they walked to the UC's vehicle, PAYNE told the UC that he (PAYNE) wanted to do good business and explained that at the **TARGET RESIDENCE** PAYNE is surrounded by "his people" and that PAYNE "controls things on the block." The UC then got into the UC vehicle and departed the area.

15. Following the controlled drug buy, agents sent the purchased substances to the Hamilton County Crime Laboratory in Blue Ash, Ohio. Forensic analysis revealed that the substances were approximately 223.5 grams of methamphetamine (Schedule II) and 14.1 grams of a mixture containing heroin (Schedule I), fluorofentanyl (Schedule I), fentanyl (Schedule II), cocaine (Schedule II), and Xylazine. Xylazine, which is not a controlled substance under the U.S. Controlled Substances Act, is a non-opiate sedative, analgesic, and muscle relaxant authorized by the U.S. Food and Drug Administration for veterinary use only. Known by the street names "tranq dope" and "zombie dope," Xylazine has been reported as an adulterant in an increasing number of illicit drug mixtures and has been detected in a growing number of overdose deaths. While it is most commonly encountered in combination with fentanyl, it has also been detected in mixtures containing cocaine, heroin, and a variety of other drugs. Xylazine's effects are particularly dangerous, resulting in wounds so serious they often require amputation.[5]

---

[5] *See generally* "Tranq Dope: Animal Sedative Mixed with Fentanyl Brings Fresh Horror to U.S. Drug Zones," The New York Times, published January 7, 2023, available at: https://www.nytimes.com/2023/01/07/health/fentanyl-xylazine-drug.html (last accessed February 27, 2023).

      **ii.**     **PAYNE sold drugs to an undercover agent on February 8, 2023.**

16.     On February 8, 2023, the UC purchased eight ounces of methamphetamine and one ounce of fentanyl from PAYNE for $2,300 at the **TARGET RESIDENCE**. The UC arranged the drug transaction by contacting PAYNE at the 7603 Phone in recorded text messages and phone calls.

17.     On February 8, 2023, at approximately 12:19 p.m., agents and officers established surveillance in the area of the **TARGET RESIDENCE**. Agents observed PAYNE's black Jeep Cherokee parked in the driveway of the residence.

18.     Approximately one hour later, around 1:15 p.m., the UC placed a recorded telephone call to PAYNE at the 7603 Phone. During the call, PAYNE directed the UC to the **TARGET RESIDENCE**. At approximately 1:23 p.m., the UC, as observed by surveillance agents, pulled into the driveway of the **TARGET RESIDENCE**. The UC noted that PAYNE's black Jeep Cherokee was no longer in the driveway of the residence; instead, a gray Honda sedan was backed into the driveway. As the UC started to exit the UC vehicle, PAYNE walked out of the front door of the **TARGET RESIDENCE**. The UC observed a large bulge and a paper towel sticking out of the pocket of PAYNE's sweatshirt. PAYNE entered the front passenger's seat of the UC vehicle. PAYNE told the UC that he put two different kinds of fentanyl in the bag for the UC. PAYNE then removed from the front pocket of his sweatshirt a paper towel containing two plastic bags. One bag contained two separate plastic bags of fentanyl (total package weight of 31.1 grams). The second bag contained methamphetamine (total package weight of 232.5 grams). PAYNE put the paper towel-wrapped bags in the middle console of the UC vehicle. The UC then handed PAYNE $2,300 of pre-recorded confidential funds.

7

19.     After PAYNE accepted the $2,300 from the UC as payment for the drugs, PAYNE told the UC that he (PAYNE) had vehicles similar to the UC vehicle and that the UC needed to be careful where the UC stored drugs in the vehicle.  PAYNE then then got out of the UC vehicle, kneeled on one knee, reached into the vehicle to put his arm around the center console, and hid the drugs in a void near the firewall of the vehicle.  PAYNE then walked back to the **TARGET RESIDENCE** and entered through the front door.  The UC then departed the area.

20.     Following the controlled drug buy, agents sent the purchased substances to the Hamilton County Crime Laboratory in Blue Ash, Ohio. Forensic analysis revealed that the substances were approximately 225.1 grams of methamphetamine (Schedule II); 15.2 grams of a mixture containing heroin (Schedule I), fluorofentanyl (Schedule I), benzyl fentanyl (Schedule I), fentanyl (Schedule II), cocaine (Schedule II), and Xylazine; and 14.2 grams of a mixture containing heroin (Schedule I), acetyl fentanyl (Schedule I), fluorofentanyl (Schedule I), fentanyl (Schedule II), Xylazine, and 3-hydrocyphencyclidine. The drug 3-Hydroxyphencyclidine (3-HO-PCP) is not a controlled substance, but is related to phencyclidine (PCP), a Schedule II controlled substance. Online sellers advertise 3-HO-PCP as a designer drug.

### iii.     PAYNE sold drugs to an undercover agent on February 22, 2023.

21.     On February 22, 2023, the UC purchased one pound of methamphetamine and one ounce of fentanyl from PAYNE for $3,200 at the **TARGET RESIDENCE**.  The UC arranged the drug transaction by contacting PAYNE at the 7603 Phone in recorded text messages and phone calls.

22.     On February 22, 2023, at approximately 1:00 p.m., agents and officers established surveillance in the area of the **TARGET RESIDENCE**.  Agents observed a grey Dodge Ram

pick-up truck, bearing Ohio license plate JYQ6682[6], VIN # 1D7HU18D83J649571, parked in the driveway of the residence. Moments later, agents observed PAYNE driving the Dodge Ram on Prescott Avenue.

23. Approximately five minutes later, around 1:06 p.m., the UC placed a recorded telephone call to PAYNE at the 7603 Phone. During the call, PAYNE told the UC he was out but would be back shortly and directed the UC to the **TARGET RESIDENCE**. At approximately 1:17 p.m., the UC parked in the driveway of 4052 Prescott Avenue, a driveway immediately next to the **TARGET RESIDENCE**. At approximately 1:20 p.m., a gray Buick four door sedan with dark tinted windows pulled into the driveway of the **TARGET RESIDENCE**. The UC observed an unknown young black male ("UM-1") carrying a backpack exit the driver's seat of the Buick and unlock the black security/storm door with a key. UM-1 then used a key to unlock the front door of the **TARGET RESIDENCE**, went inside, and closed both doors.

24. At approximately 1:27 p.m., the Dodge Ram pulled into the driveway of the **TARGET RESIDENCE** and PAYNE exited the driver's seat of the truck. The UC observed an unknown white male ("UM-2") who was walking on the sidewalk in front of the **TARGET RESIDENCE.** UM-2 approached PAYNE, had a short conversation, then walked away out of the UC's sight. PAYNE then walked to the front door of the **TARGET RESIDENCE** where PAYNE attempted to open the door, pounded on the door with his hand, then walked away toward the UC's vehicle. As PAYNE was approaching the UC's vehicle, the front door of the **TARGET RESIDENCE** opened, and PAYNE turned and entered the front door of the **TARGET RESIDENCE**. A few moments later, the UC saw PAYNE outside on the west side

---

[6] Ohio license plate JYQ6682 is registered to a 2003 Dodge Ram 1500, with a registered owner of Joshua D. Payne residing at 4056 Prescott Avenue, Dayton, Ohio (the **TARGET RESIDENCE**).

of the **TARGET RESIDENCE** waving for the UC to come to the back of the house.  The UC walked into the back door of the **TARGET RESIDENCE** and observed UM-2 holding two empty clear zip lock sandwich bags.  UM-2 was walking toward a table on which there were bags of what the UC recognized as processed marijuana.  The UC noted that the table was also cluttered with bags of unknown powder substances.  PAYNE, who was in the kitchen of the **TARGET RESIDENCE**, told the UC he would meet the UC by the UC's car.[7]  The UC then exited the back door of the **TARGET RESIDENCE** and returned to the UC car.

25.     At approximately 1:34 p.m., PAYNE walked from the backyard of the **TARGET RESIDENCE** carrying an orange Patron tequila box in his right hand.  The UC got out of the UC vehicle and met PAYNE at the back of the UC vehicle.  PAYNE handed the UC the Patron tequila box which contained a plastic bag containing suspected fentanyl (total package weight of 28.7 grams) and a plastic bag containing suspected methamphetamine (total package weight of 453.7 grams).  The UC then handed PAYNE $3,200 of pre-recorded confidential funds.  PAYNE returned to the **TARGET RESIDENCE** and the UC departed the area.

26.     A trained BCI agent field tested the evidence utilizing a MX908 testing device. The bag containing the suspected methamphetamine tested positive for methamphetamine. The smaller bag containing suspected fentanyl tested positive for fentanyl and diphenhydramine.[8] Agents submitted the purchased substances to the Hamilton County Laboratory for forensic analysis; those results are pending.

//

---

[7] The UC had previously told PAYNE that he (the UC) was recovering from a severe case of COVID, which is why PAYNE maintained some distance between himself and the UC.

[8] Diphenhydramine is not a scheduled substance. Based on my training and experience, I know that drug traffickers frequently dilute controlled substances with other substances—known as "cut"—to increase the quantity of drugs, and thereby increase their profits.

**D. Following these controlled purchases, PAYNE has continued to communicate with the UC about drug trafficking.**

27.     Since the UC's controlled purchases on February 1, February 8, and February 22, 2023, PAYNE, using the 7603 Phone, has continued to communicate with the UC. The most recent exchange between PAYNE and the UC occurred on Wednesday, March 1, 2023. The UC and PAYNE discussed the UC possibly purchasing drugs from PAYNE tomorrow (March 2, 2023).

**E. PAYNE's YouTube and Instagram accounts depict a lifestyle consistent with drug trafficking.**

28.     YouTube and Instagram are popular social media platforms that allow users to create a profile and interact with other individuals online through comments and messaging. One of YouTube and Instagram's primary features is the ability to create, edit, and share photos and videos. PAYNE maintains a YouTube channel named "jpdachorusman" via YouTube user account "jpdachorusman7731" and an Instagram account with username "jpdarealist31."[9]  I have reviewed PAYNE's Instagram and YouTube content, described in more detail below, and believe that the content is consistent with the lifestyle of drug traffickers, in which flashy displays of wealth are considered part of the business (that is, boasts about wealth function as social currency and as an inducement for others to join or patronize their successful business). The glorification of violence and the glamorization of firearms are also consistent with the lifestyle of drug traffickers because such images project the drug trafficker's power and deter those who may attempt to rob the drug trafficker.

29.     I acknowledge that flaunting a lifestyle of luxury and glorifying violence are present in many art forms, and do not, in and of themselves, suggest any wrongdoing by the creator.

---

[9] I recognize PAYNE, whom I have physically observed on multiple occasions, as the individual depicted in the user profile of these accounts.

11

However, as I describe in more detail below, the evidence suggests that PAYNE was actively trafficking drugs during the creation and promotion of at least some of this content. I know, based on my training and experience, that drug traffickers frequently use social media accounts to advertise for their business, and I believe PAYNE was using these accounts to do so. I also know, based on my training and experience, as well as my conversations with fellow law enforcement officers, that it is very common for drug traffickers operating in the Dayton, Ohio area to post music videos and photographs online that accurately describe their exploits.

30. Importantly, my knowledge of PAYNE's criminal history, as well as his recent criminal activity, provides additional context for PAYNE's online content. PAYNE's criminal history includes multiple felony convictions for drug possession and trafficking (the most recent of which was in 2015). Additionally, PAYNE was the subject of a prior FBI drug trafficking investigation in 2020 that resulted in sworn statements by a fellow FBI agent, which I have reviewed. I learned that on August 24, 2020, the Dayton Police Department ("DPD") responded to a shooting near PAYNE's residence located at 301 West Hillcrest. Information DPD officers gathered at the scene implicated PAYNE as being present at the vehicle where the victim was shot, then running inside his house at 301 West Hillcrest. Officers saw PAYNE inside the house and forced entry due to concerns about additional victims and evidence possibly being removed from the victim's car and destroyed. Officers discovered that PAYNE was the lone occupant of the house. DPD officers secured the house and obtained a state search warrant for the residence. While searching, they discovered, among other things, a loaded Glock handgun; a bag containing 557 grams of methamphetamine; 70 grams of powder cocaine; 66 grams of solid cocaine; and items used to process, mix, and sell controlled substances, such as a blender, scale, and five cell phones. Officers also found in the house PAYNE's wallet and personal items such as his baby book, along

with mail addressed to PAYNE at that residence. Based on the evidence gathered by DPD officers, I believe that in August 2020 PAYNE was using his residence—301 Hillcrest Avenue—to store trafficking amounts of drugs and other tools of the drug trafficking trade.

31.     PAYNE appeared on law enforcement's radar again in 2022. In addition to the UC purchases I described above, I participated in assisting local law enforcement using a confidential informant in the winter of 2022 to arrange for, and ultimately complete, multiple drug purchases directly from PAYNE.

### i. PAYNE's YouTube Channel

32.     PAYNE's YouTube channel contains several music videos featuring PAYNE and/or others insinuating violence (such as kidnappings), brandishing firearms, and displaying large amounts of United States currency.[10] A video posted on March 26, 2018, depicts PAYNE flashing a substantial amount of cash while appearing to conduct a hand-to-hand drug transaction.

33.     More recently, PAYNE's videos have featured him flashing luxury designer name brands such as Gucci and Cartier. In a music video[11] posted approximately one year ago, PAYNE handles large amounts of cash and wears conspicuous designer clothing and jewelry. YouTube allows users to post public comments on videos, and one of the comments on this video, and PAYNE's response to that comment, is as follows:

---

[10] At least one of the videos posted to PAYNE's YouTube account contains the disclaimer that "all weapons, drugs, and alcohol used in this video are props." However, based on my training and experience, I recognize that the firearms featured in the video are real. PAYNE does not claim that any of the U.S. currency is fake and, based on my training and experience, the cash appears to be real and not counterfeit.

[11] *Available at:* https://www.youtube.com/watch?v=4TC9WrVwn28



34.     I know, based on my training and experience, that "cappin" means "faking" or "lying." There can be significant cache associated with being a successful drug trafficker, and PAYNE appears to acknowledge the comment—that there is no lying or faking in his video—and that PAYNE is a "realist" in "tha game." I know, based on my training and experience, that "tha game" is a slang term for the drug trafficking business. Significantly, this video has 65,000 views, demonstrating its efficacy in reaching a large audience and thus its utility in advertising PAYNE's drug trafficking.

35.     Significantly, several of the music videos associating PAYNE with weapons and large amounts of U.S. currency were filmed outside and inside the **TARGET RESIDENCE,** suggesting that evidence of drug trafficking is located there.  The below represents a small example of screenshots from videos posted on the "jpdachorusman" YouTube account that depict PAYNE flaunting what I believe to be the proceeds of illicit drug transactions and espousing a violent lifestyle:



14






**ii. PAYNE's Instagram Account**

36.    On Instagram, PAYNE began posting photographs of himself flashing expensive jewelry and cash beginning in March 2019 and continues to do so through the present. During my electronic and physical surveillance of PAYNE I have never seen him going to or from a workplace or job of any kind, suggesting an illegitimate source of the cash he uses in his posts. The date of this content, coupled with the FBI's previous investigation into PAYNE's drug trafficking around the same time, suggests that PAYNE has been engaging in drug trafficking for several years. Below are examples of such postings from June, July, and August 2019, respectively:

15

 

37.    Additionally, the below represents a small example of screenshots from short videos posted on the "jpdarealist21" Instagram account that depict PAYNE flaunting what I believe are the proceeds of illicit drug dealing:

 

38.    I know, based on my training and experience, that Instagram users frequently use cell phones to take photographs and record videos to upload to their profiles directly from their devices. I believe it is very likely that PAYNE's Instagram content was recorded with a cell phone, which is consistent with PAYNE's current use of the 7603 Phone—a cell phone—to arrange controlled purchases with the UC.

**F. The evidence suggests that PAYNE resides at the TARGET RESIDENCE and uses the TARGET RESIDENCE to store his drugs, drug proceeds, and drug trafficking paraphernalia.**

39.     PAYNE lists the **TARGET RESIDENCE** as his home address on his Ohio driver's license and in public source databases. Further, PAYNE has multiple active car registrations, including the grey Dodge Ram, that list the **TARGET RESIDENCE** as PAYNE's home address. On multiple occasions, agents and officers have conducted spot check surveillance of the **TARGET RESIDENCE** and observed cars registered in PAYNE's name parked in the driveway. I know, based on my training and experience, that drug traffickers frequently use multiple vehicles in an effort to evade detection by law enforcement. I believe that PAYNE uses multiple vehicles, including the grey Dodge Ram and black Jeep Cherokee the UC saw during the controlled purchases described above, in furtherance of his drug trafficking activities.

40.     From February 24, 2023, to the present, agents began receiving court-authorized cell site location data for the 7603 Phone, known by investigators to be used by PAYNE. The cell site location data shows that PAYNE resides overnight at the **TARGET RESIDENCE**. I have no evidence suggesting that anyone besides PAYNE lives at the **TARGET RESIDENCE.** Agents have continued to physically surveil the **TARGET RESIDENCE** since receiving court-authorized cell site location data for the 7603 Phone and have observed vehicles associated with PAYNE and the 7603 Phone at the **TARGET RESIDENCE** at the same time, further bolstering my belief that PAYNE is the user of the 7603 Phone and that he resides full-time at the **TARGET RESIDENCE.**

41.     As I described in more detail above, in August 2020, DPD officers gathered evidence suggesting that PAYNE stored drugs, drug trafficking paraphernalia, and a loaded Glock handgun at his residence which, at that time, was a house located at 301 Hillcrest Avenue.

17

The evidence suggests that PAYNE, who now lives at the **TARGET RESIDENCE**, is using the **TARGET RESIDENCE** in the same manner as he used his previous house at 301 Hillcrest Avenue: as a base for his drug trafficking business. In my training and experience, I know that it is common for long-term drug traffickers—"career" traffickers—to develop a preferred method of operation for their drug trafficking business. I believe that PAYNE's use of the **TARGET RESIDENCE** is consistent with his past drug trafficking methods, and that evidence of his current drug trafficking operation will be found at the **TARGET RESIDENCE**.

42.    I believe, for all the reasons I give above, as well as for the additional reasons I give below, that PAYNE and coconspirators, such as UM-1 and UM-2, are using the **TARGET RESIDENCE** to further their drug trafficking activities, and that evidence of drug trafficking activities will be found inside the **TARGET RESIDENCE** and in any vehicles located at the **TARGET RESIDENCE**. Based on the UC's conversation with PAYNE on March 1, 2023, discussing the UC purchasing drugs from PAYNE on March 2, 2023, it is reasonable to believe that PAYNE currently possesses drugs, and that PAYNE is storing the drugs in the same location as in their previous transactions: the **TARGET RESIDENCE**.

43.    I know, based on my training and experience, that large-scale drug traffickers frequently use residences for the purpose of storing illegal drugs, records of drug transactions, large amounts of financial instruments including currency, jewelry, precious metals, and other items purchased with drug proceeds; and that such residences often contain evidence of co-conspirator activity, and financial transactions related to obtaining, transferring, secreting, or spending large sums of money made from engaging in illegal drug trafficking activities.  I therefore believe PAYNE is currently using the **TARGET RESIDENCE** as described throughout this affidavit to conceal evidence of day-to-day selling of narcotics, and that evidence of drug

18

trafficking—such as drugs, drug ledgers, firearms and ammunition, drug-related manufacturing equipment and paraphernalia, financial instruments such as cash, and cell phones, such as the one PAYNE used to communicate with the UC to arrange drug transactions—are likely to be found at the **TARGET RESIDENCE**.

## BACKGROUND ON DRUG TRAFFICKERS

44.     Based upon my training and experience, including my participation in this investigation and other drug trafficking investigations, I know that:

a.   drug traffickers often place assets in names other than their own to avoid detection of these assets by government and law enforcement agencies;

b.   drug traffickers often place assets in names of business/corporate entities as nominee title holders in order to avoid detection of these assets by government and law enforcement agencies; even though these assets are placed in the names of other persons or entities, the drug traffickers continue to use these assets and exercise dominion and control over them;

c.   drug traffickers must maintain and/or have quick access to large amounts of United States currency or other liquid assets in order to maintain and finance their ongoing drug business. Drug dealing is a cash business.  Customers pay for drugs with cash and dealers commonly purchase drugs from their suppliers with cash.  Drug dealers commonly keep large sums of currency, financial instruments, precious metals, jewelry, and other items of value which represent either the proceeds from drug sales or are intended for the purchase of controlled substances.  When drug dealers amass such wealth, they often attempt to legitimize that wealth or otherwise conceal it and its origin from discovery by law enforcement.  To accomplish this, drug

dealers often use different techniques, including the use of foreign and domestic banks and their attendant services, including savings and checking accounts, securities, cashier's checks, money drafts and letters of credit to exchange drug proceeds into money that appears to come from a legitimate source. Drug dealers also purchase real estate or vehicles, and establish shell corporations and business fronts that they use to launder drug proceeds. Drug dealers often utilize fictitious or "straw-holder" owners to conceal the true ownership, vehicles, or other valuable items purchased with the proceeds of illicit drug sales. In addition, drug dealers often use wire transfers, cashier's checks, and money orders to pay for drugs or other costs relating to their distribution business. Drug dealers often keep these items of value, and records relating to them, on their person or in their residences, stash houses, and/or vehicles where they are concealed from law enforcement and readily available;

d. drug traffickers often maintain money counting machines, money wrappers and rubber bands, boxes, bags, brief cases, suitcases, or containers used to carry drug proceeds and/or controlled substances;

e. drug dealers often dilute, or "cut," drugs in order to maximize the volume of drugs they have to sell, and thus their profits. Drug dealers use various substances to dilute drugs, including mannitol, mannite, lactose, Vitamin B12, and MSM. Drug dealers use equipment, such as scales, sifters, hammers, grinders, razor blades, glass panes, mirrors and kilo or pound presses as part of the dilution or "cutting" process. Once the drug has been "cut," drug dealers usually will repackage it, often in smaller quantities, using masking agents, tape, heat sealers and heat-sealed bags,

ziploc bags, plastic bags, paper bindles, and/or other containers for redistribution. It is common for drug dealers to maintain such equipment and supplies in their residences, vehicles, places of business, and/or stash houses;

f.   drug traffickers often maintain in their residences, vehicles, and/or business establishments records relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed including some or all of the following written books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers (i.e. bank account records, wire transfer records, bank statements, safe deposit box keys and records, money wrappers, rubber bands, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the illegal sale of drugs);

g.   drug traffickers commonly use cellular phones to communicate with other members of the drug trafficking organization (DTO), narcotics sources of supply, and/or narcotics customers in furtherance of violations of the Uniform Controlled Substances Act. Drug dealers often keep these items on their person or in their residences, stash houses, businesses, and/or vehicles where they are readily available;

h.   drug traffickers commonly provide illegal narcotics to their organization on consignment sale to their customers, who subsequently pay for the drugs after reselling said drugs. Therefore, the above-mentioned books, records, receipts, notes, ledgers, etc., will be secured by the drug traffickers within their residences,

vehicles, and/or their businesses for their ready access for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

i.  drug traffickers commonly conceal contraband, including controlled substances, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses, and telephone numbers of drug associates within their residence, place of business, their vehicles, or the curtilage of their residence or business for ready access and to hide them from law enforcement agencies;

j.  drug traffickers commonly will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services (i.e., safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts), and evidence of this includes documents like stock certificates, bonds, deposit certificates, and travelers checks;

k.  drug traffickers often have photographs or video movies of themselves, their co-conspirators, firearms, and the property and assets purchased with drug proceeds. These photographs and video movies are normally in the drug trafficker's possession at their residence, place of business, and/or vehicles, and are frequently stored on electronic devices such as cell phones;

l.  drug traffickers' methods of transporting drugs include but are not limited to: commercial airlines, private motor vehicles, and government and contract mail carriers. I know that the vehicles, residences, or business locations of drug traffickers will often contain records of drug-related travel. These records may include airline ticket receipts, credit card receipts, traveler vouchers, hotel and

restaurant receipts, photographs, canceled checks, maps, and written directions to locations rental car receipts and luggage tags reflecting points of travel;

m.  drug traffickers commonly have firearms in their possession (on their person, at their residence, and/or their business) including but not limited to handguns, rifles, shotguns, and automatic weapons. These firearms are most often used and/or maintained in order to protect and secure a drug trafficker's property or manufacturing operation, and to deter others from robbing the drug trafficker of controlled substances and/or drug proceeds;

n.  drug traffickers will often accumulate and maintain substantial amounts of drug proceeds, specifically currency, over a period of years, so that the proceeds can be used in later years for personal asset acquisitions and/or expenditures during periods when a drug trafficker is not distributing drugs;

o.  drug traffickers commonly will maintain residence(s) separate from their primary residence to serve as "safe houses" where the traffickers may stay for periods of time. I know that these residences, which may be occupied by other conspirators or associates, may contain elements of the traffickers' drug crimes to include all items noted above;

p.  drug traffickers commonly have evidence of purchases of goods used in the manufacture of controlled substances secreted in their residences, businesses, and/or vehicles; and

q.  drug traffickers commonly secrete in their residences, vehicles, and/or places of business, over a period of years, items such as those identified in the above paragraphs.

## TECHNICAL TERMS

45.     Based on my training and experience, I use the following technical terms to convey the following meanings:

> a.   Storage medium: A storage medium is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

46.     As described above and in Attachment B, this application seeks permission to search for records that might be found at the **TARGET RESIDENCE** (hereinafter "PREMISES"), in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

47.     *Probable cause.*  I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

> a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a

computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

48.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and

26

malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or

27

consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

49. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the

28

warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.

However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

50. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

51. While our investigation has not revealed evidence of anyone residing at the PREMISES other than PAYNE, it is nonetheless possible that other people may share the PREMISES as a residence, or may be present at the PREMISES at the time of the execution of the search warrant. It is therefore possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is probable that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure of those items as well. For any device seized, law enforcement will seek an additional warrant to review the contents of that device to ensure the search complies with the Fourth Amendment.

## CONCLUSION

52.     I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

## REQUEST FOR SEALING

53.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time.   Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

Eric J. McIntosh
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me via reliable electronic means on March __2__, 2023

Caroline H. Gentry
United States Magistrate Judge

## ATTACHMENT A

*Property to Be Searched*

The property to be searched is 4056 Prescott Avenue, Dayton, Ohio 45406 (the **TARGET RESIDENCE**), pictured below, and further described as a single-family residence with red brick, white trim, and red roof shingles. The stained wood front door has a black security/storm door. The property to be searched also includes any vehicles located on the premises or the curtilage of the premises during the execution of the search warrant, including, but not limited to, the black Jeep Cherokee bearing Ohio license plate JJY9189, VIN # 1C4RJFAG2JC286226, and the grey Dodge Ram 1500 bearing Ohio license plate JYQ6682, VIN # 1D7HU18D83J649571.

 



## ATTACHMENT B

*Items to be Seized*

All items and records relating to violations of Title 21 U.S.C. §§ 841 and 846, those violations involving Joshua Daniel PAYNE and/or co-conspirators and probable co-conspirators and occurring in or after July 1, 2020, including:

a. Any and all controlled substances (as defined under Title 21, United States Code, § 812), including, but not limited to, methamphetamine, cocaine, and fentanyl;

b. Any information related to the use, possession, receipt, transfer, transportation, and/or purchase of controlled substances;

c. Records of drug customers and related identifying information;

d. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

e. Any information related to sources of drugs or others involved in the possession or distribution of drugs (including names, addresses, phone numbers, or any other identifying information);

f. Paraphernalia associated with the manufacture, distribution, sale, import, export, storage, conversion, preparation for sale and use of any controlled substances, including scales, measuring devices, bottles, balloons, baggies, plastic wrap, plastic envelopes, film canisters and cutting, conversion, and adulteration agents;

g. Records showing evidence of importing, smuggling, and distributing drugs, including books, ledgers and diaries, address books and lists, buyer and seller

lists, notebooks, IOU's, spreadsheets, rolodexes, telephone bills, telephone answering pads, bank and financial records, wire transfer records, express consignment mailing labels (including Federal Express, DHL, U.S. Postal Express Mail, UPS, and other similar labels), evidence of offsite storage (such as storage locker receipts and safety deposit box rental records and keys), documents showing domestic or international travel (such as airline tickets, itineraries, passports, and the like), and receipts showing imports or exports (such as shipper's export declarations, bills of lading, invoices, tax identification number paperwork, and other similar documents);

h. Currency (whether U.S. or foreign) and financial instruments, including travelers checks, bonds, stock certificates, cashier's checks, certificates of deposit, and money orders, derived from the sale of controlled substances in violation of Title 21, United States Code, §§ 841 and 846, and money wrappers, rubber bands, money containers, and money counting machines;

i. Precious metals, jewelry, or other high-value items that could be obtained with the proceeds of the sales of controlled substances;

j. Any and all records, documents, and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other high-value items that could be obtained with the proceeds of the sales of controlled substances;

k. Any boxes, bags, briefcases, suitcases, containers, or other items that could be used to mail, carry, import, export, smuggle, or transport marijuana or any other controlled substances;

34

l.  Photographs (both paper and digital form) and video and audio recordings which document an association with other co-conspirators and/or display drug trafficking methods, narcotics, firearms, or money and proceeds from narcotics transactions;

m.  All records, documents, and materials showing control, possession, custody, dominion or other indicia of occupancy over physical premises, including but not limited to: personal mail, checkbooks, personal identification, personal effects, notes, other correspondence, utility and other bills, internet service provider documents, letters, rent receipts, mortgage and loan documents, financial documents, vehicle registration information or ownership warranties and keys;

n.  Any and all electronic or communication devices including, but not limited to, cellular telephones (including the cell phone assigned call number (404) 386-7603), smart phones, portable electronic devices such as tablet computers, laptops, iPads, or electronic storage media, and other electronic or communication devices which could be used to facilitate drug trafficking;

o.  Firearms and ammunition;

p.  Firearms accessories, such as ammunition magazines, silencers, gun cases, magazines, and spare parts;

q.  Firearms source records, including lists of prices, correspondence, notation logs, receipts, journals, books, telephone records, telephone bills, address books, bank statements, and other documents or devises noting the price, quantity, dates, and/or times when firearms were purchased possessed,

transferred, distributed, or sold, and the identities of the parties involved in the transaction;

r.  Photographs, video and audio recordings, text messages, chats, emails, and other communications (and associated contact information), in electronic or other form, related to the possession, acquisition or transfer of controlled substances, firearms, firearms parts and accessories, or ammunition;

s.  Any information related to the acquisition of cars (including rental vehicles) or cellular phones; and

t.  Records and information relating to the identity or location of coconspirators.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2.  For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence

36

of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this

attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.